(Reap. Dec. 10674)

The Thrifty Equipment Co.
T. D. Downing Co. } *v.* United States

Entry No. 6020, etc.

(Decided February 4, 1964)

*Lawrence & Tuttle (Barnes, Richardson & Colburn* by *Hadley S. King, E. Thomas Honey, Edward N. Glad,* and *Norman Schwartz* of counsel) for the plaintiffs.

*John W. Douglas,* Assistant Attorney General *(Richard E. FitzGibbon* and *Daniel I. Auster,* trial attorneys), for the defendant.

Ford, Judge: The appeals for reappraisement listed in schedule A, annexed hereto and made a part hereof, consolidated for the purpose of trial, relate and are limited to the importation of certain track link assemblies, or track chains, for D-6, D-7, or D-8 tractors, exported from England during the period beginning 1955 through 1957. The merchandise was appraised upon the basis of foreign value of such merchandise, as defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, 19 U.S.C., section 1402(c), at the following values:

D-6 £135.0.0, less 20%
D-7 £190.0.0, less 20%
D-8 £255.0.0, less 20%

Plaintiffs herein do not dispute that the foreign value of such merchandise is the proper statutory basis for appraisement, but contend that the following represent the proper dutiable values:

D-6 39 links_____ £64.0.0
D-7 37 links_____ £125.0.0
D-8 39 links_____ £160.0.0

Plaintiffs also contend that if the linkage exceeds the standard as set forth above, an additional *pro rata* charge would be made for each additional linkage as follows:

D-6_____ £3.0.0
D-7_____ £4.10.0
D-8_____ £6.10.0

Section 402(c) of the Tariff Act of 1930, as amended, *supra,* reads as follows:

(c)   The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade,

including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

At the original hearing, nine appeals were consolidated for trial. Subsequently, on rehearing, one of the appeals was found to cover other merchandise outside of the period of importation involved herein and it was severed and suspended. An affidavit of Frederick Robert Readhead, sworn to before a Commissioner of Oaths, was received in evidence as plaintiffs' exhibit 1, as well as an agent's report received as defendant's exhibit A. Exhibit A, a Treasury representative's report, states that the representative had interviewed Mr. Readhead and Mr. Locke. The report states, under the heading of foreign value, that identical merchandise was freely offered for sale for home consumption in England, without restrictions of any kind. The report further states that the merchandise was sold in England as per pricelist attached to the report, the prices for the chain assemblies being effective since June 1953 and the balance of the items since May 1955. The representative stated that Mr. Locke advised him that this pricelist represented retail prices and that distributors were allowed a 20 per centum discount.

The authenticity of plaintiffs' exhibit 1 was questioned in the briefs originally filed and, thereafter, by order of Judge Scovel Richardson on December 29, 1961, the case was restored for all purposes. Counsel for plaintiffs later moved to withdraw plaintiffs' exhibit 1, which order, dated March 23, 1962, was granted by Judge Richardson. The case was subsequently heard at New York on November 26, 1962, at which time plaintiffs introduced the oral testimony of Frederick Robert Readhead, as well as a list or tabulation of sales received as exhibit 2.

Mr. Readhead testified that he is chairman and director of Readheads' Engineering and has been with the firm since 1903; that he was in charge of sales for home consumption in England during the period covering the importations involved herein; that the price did not vary because of quantity in the sales for home consumption; that he had prepared for him a list of sales for home consumption for the period of 1955 through 1957, which was attached to his original affidavit; that he requested Mr. Locke, his secretary, to have the list of sales prepared from the books of the company kept in the regular course of business; that Mr. Locke prepared this list under his supervision. This list of sales is received as plaintiff's exhibit 2.

The witness further testified that the standard linkage for the D-6 chain is 39 links, for the D-7 is 37 links, and for the D-8 chain is 39 links; that he could not recall how many track chains were sold for home consumption during this period nor to whom they were sold,

since his firm produced approximately 2,000 track chains a month. At this point, the case was continued for further hearing.

At the final hearing, counsel for plaintiffs introduced an affidavit of William Locke, sworn to before the American consul on December 19, 1962, which was received in evidence as plaintiffs' exhibit 3. The affiant, Locke, stated that he is secretary of Readheads (Salisbury), Ltd.; that he is in charge of the office records of the company, kept in the regular course of business; that he is familiar with all sales made by the company either for home consumption or for export; that, during the years 1955 through 1957, Readheads (Salisbury), Ltd., did not offer for sale for export to the United States tractor equipment or track chains to anyone other than The Thrifty Equipment Co. The affiant then stated that the standard track chain for the earlier D–6 tractor consisted of 39 links, but the later D–6 tractor required a chain of 40 links; that the standard track chain for the D–7 tractor consisted of 37 links; that the standard track chain for the D–8 consisted of 39 links; that his company, during the period 1955 through 1957, freely offered and sold for home consumption in England the same track chain as set forth in the schedule annexed to the affidavit, which schedule was compiled by him from the books kept in the regular course of business at the request of and under the supervision of Mr. Frederick R. Readhead; that the schedule attached includes all sales of D–6, D–7, and D–8 track during the period in question. Affiant further stated that the price for home consumption did not vary because of quantity, and all sales were made without regard to any existing pricelist; that the prices charged were for standard track chain, and if less linkage was required, an allowance was made, or if additional linkage was required, an additional charge was made as follows:

| | | |
|---|---|---|
| D–6 track | £3.0.0. | per link |
| D–7  " | £4.10.0  | "  " |
| D–8  " | £6.10.0  | "  " |

The Government then offered and there was received in evidence reports of Treasury representatives, defendant's exhibit B, defendant's collective exhibit C, defendant's collective exhibit D, and defendant's collective exhibit E.

Defendant's exhibit B, after discussing the difficulties in arranging appointments with Readheads Engineering, enclosed as exhibits copies of correspondence from Readheads Engineering Works, as well as a list of sales of chain in the home market. This list of sales agrees in prices with exhibits 2 and 3.

Defendant's collective exhibit C contains a summary of an interview with Mr. Readhead and Mr. Locke, as well as the names of three

purchasers of the involved merchandise in England. Attached to the exhibit are letters and *pro forma* invoices from Readheads Engineering to the various customers, as well as a statement in writing from Mr. Locke, indicating that the pricelist was not a firm list but merely a guide. The report also indicates that one of the customers for this merchandise was declared bankrupt and liquidated in May 1958 and the Treasury representative was, therefore, unable to confirm the home market prices charged for the involved merchandise.

Defendant's collective exhibit D confirms that Tractor Spares, Ltd., did make purchases from Readheads Engineering Works, which were subsequently the subject of three suits. However, it was indicated that there is a discrepancy of approximately 1 year in the dates of the invoices. The report also establishes the prices for chains for the D–7 and D–8 tractor at the prices contended for by plaintiffs. The report further indicates that the third company doing business with Readheads Engineering Works had also gone into bankruptcy and that the invoices of the sales were not available.

Defendant's collective exhibit E has attached to it a letter of Tractor Spares, Ltd., confirming the information contained in defendant's collective exhibit D. This report also encloses a letter of the Treasury representative to the liquidator of the third customer, referred to in defendant's collective exhibit C, and a reply indicating that the records of that company are no longer available.

The appraiser, apparently by virtue of the report of the Treasury representative, defendant's exhibit A, appraised the merchandise on the basis of the pricelist, less 20 per centum. There is no question that a pricelist exists, as a copy was attached to defendant's exhibit A. Under 28 U.S.C., section 2633, pricelists are specifically enumerated among other items as being admissible in evidence for use in finding value in reappraisement proceedings. However, for a pricelist to have any evidentiary weight, it must be shown by competent evidence to have been circulated in the trade. Pricelists which are not circulated in the trade have no evidentiary value. *United States* v. *Philipp Brothers Chemicals, Inc.*, 46 Cust. Ct. 803, A.R.D. 134, and cases cited therein. Evidence establishing actual sales of merchandise at the list price would tend to support the circulation of the pricelist and the values therein set forth. However, the list of sales for home consumption contained in plaintiffs exhibits 2 and 3 and defendant's collective exhibits B and C, as well as the information contained in defendant's collective exhibit E, confirm sales at the prices contended by plaintiffs, rather than substantiating sales at the list price, less 20 per centum, at which the merchandise was appraised.

It is to be noted that the information supplied in defendant's collective exhibits D and E relative to Tractor Spares, Ltd., indicates a discrepancy of 1 year, insofar as the date of the invoice is concerned, but does confirm the prices contended for by plaintiffs. It is also to be noted that a number of legal actions have been brought between Readheads, Ltd., and Tractor Spares, Ltd., so that there is apparently no feeling of kinship between the parties. In view of this, the weight of evidence relating to the price at which the merchandise involved was sold is substantial. The discrepancy in the date does not materially affect the weight given to the evidence, since defendant's exhibit A states that the pricelist, insofar as the chain and chain assemblies were concerned, "became effective in June 1953," long before the period involved herein. Assuming, *arguendo*, that the earlier date is the correct one, it, nevertheless, does not corroborate the fact that the pricelist was not adhered to even at that point of time, though the list was then in existence.

The affidavit of Mr. Locke, plaintiffs' exhibit 3, with the annexed list of sales, represents substantial evidence containing facts from which the court may ascertain the value. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495. This evidence was further buttressed with the oral testimony of Mr. Readhead who, although he was vague on a number of things, did tend to establish the price at which the involved merchandise was sold.

On the basis of the present record and for all of the reasons hereinabove set forth, I find as matters of fact:

1. The merchandise here involved consists of tractor or track chains (track link assemblies), in various sizes and bearing various invoice prefixes, dependent upon the size of the tractor, exported from England in 1955, 1956, and 1957.

2. Such merchandise was not freely offered for sale to all purchasers for exportation to the United States in 1955, 1956, and 1957.

3. Such merchandise was freely offered for sale to all purchasers for home consumption in the principal markets of England, in the ordinary course of trade, in 1955, 1956, and 1957 at the following prices, said prices not varying with the quantities purchased:

| | |
|---|---|
| 39 link D–6 track chain | £64.0.0 |
| 37 link D–7 track chain | £125.0.0 |
| 39 link D–8 track chain | £160.0.0 |

subject to a *pro rata* allowance or addition for each link that fell short of or exceeded the above linkage as follows:

| | |
|---|---|
| D–6 | £3.0.0 |
| D–7 | £4.10.0 |
| D–8 | £6.10.0 |

4. The export value, or such value, as defined in section 402(d) of the Tariff Act of 1930, of similar merchandise is no higher.

Accordingly, I hold as matters of law:

1. That foreign value, as defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis of value for the merchandise here involved.

2. That such values for items invoiced as D–6, D–7, or D–8 track chains or track link assemblies are the prices indicated in finding of fact No. 3, *supra*.

3. That as to all other merchandise, the appraised value is the correct value.

Judgment will be entered accordingly.